for argument, Isabel Litovich et al. and the Goldman Sachs Group Inc. et al. Yes, Mr. Frederick, whenever you're ready. Thank you, Judge Lee, and may it please the Court, David Frederick, for the plaintiffs. I'd like to start with a recusal issue before addressing the merits. On recusal, 28 U.S.C. section 455B.4 requires recusal when a judge or his or her spouse owns a financial interest in one of the parties. Section 455C requires the judge to be reasonably informed about the holdings of people within his or her household. And 455E precludes waiver of any party if there is a violation of B.4. In this case, there was unquestionably a violation. So, Mr. Frederick, we have Exxon and we've got Brock. And Brock is nonbinding, but I think indistinguishable. Tell me if there's any way to distinguish Brock. Well, in Brock, as I recall, the court had already transferred to another judge who would have resolved the issue de novo. Here, I would submit. That was, I think that's Exxon. So I think Brock, like here, if you remember differently, maybe I'm, it may well be that I misremember. But I think when I looked at Brock, that it's on all fours, but nonbinding, in the sense that there's not another district court who's looked at the de novo issue. I think that the question, as I recall, Brock, it was a contract dispute or contract issue or contract interpretation. I think there's a way to distinguish interpretation of a complaint where there are plausibility inferences that are drawn. But I would go further to say that a reason not to do just a de novo review would be it would render a violation of B-4 essentially toothless. And it would be odd to suppose that where a judge violated B-4 in a question of law, that there is somehow a different remedy than where a judge violated B-4 where there was a fact question. And the different remedy, because Exxon is binding, is de novo review by a district judge, as opposed to de novo review by a three panel circuit court. In Exxon, though, it was subject to appeal to a three judge court. So structurally, it was a different posture than what we have here. What we're asking for is that there be an impartial district judge who rules on the complaint subject to appeal by three non-conflicted judges who review that. We have not had that. And I would point out further that the timing of the disclosures occurred after the case had had a notice of appeal divesting the court of jurisdiction. So we're in a posture now where the case has been reassigned to Judge Caproni. Judge Caproni is awaiting this court's decision on whether or not to allow even something as simple as an amendment to the complaint, which we would submit ought to happen as a matter of course, to avoid the problem of public confidence of having this court essentially agree with Judge Lyman, who was in a conflicted position at the time of the initial decision. So in our view, the proper remedies are as follows. There should be a vacate and remand. Judge Caproni ought to have the opportunity to review the complaint as amended. We would submit we will ask for an amendment. It's been over two years since we had a judge decide that complaint, and there has been further investigation. But if you were to decide that there was de novo review in this court, I would submit that the multiple ways that the judge decided inferences in the defendant's favor require reversal and remand. The judge made inferences regarding the pricing differences between round ones. But I suppose if we were just doing de novo review, it's not an argument about what the district judge did. It's an argument about what inferences under Twombly and subsequent antitrust 12B6 case law tells us we should do and accept as available inferences of the conspiracy and the like, right? I mean, we wouldn't – if we were just doing a de novo review, why would we work off of Judge Lyman's opinion? Well, the reason why I want to highlight the errors of the inferences is to steer you away from making similar inferences if you were to do a de novo review, which we would submit you should not do. You should vacate and remand the case. But in fourth – Maybe I'm, again, missing something. If we were to decide that you're right, that the judge erred in dismissing the complaint for the various reasons he gave, then we would send it back for de novo review, would we not? And we don't even have to reach the disqualification issue. You could do that, certainly, and that would be an acceptable reason. And I would submit that the issues about the inferences are a reversible error on themselves. I do think Judge Rakoff, candid to the court, that the issue of the stock ownership is one that has had a sufficient public vetting. It is an issue in the news. It is important for the judges of this court to announce rules that reflect the statutory policy judgments that Congress has made, although there's not a remedy in 455. It is incumbent upon you to design what an appropriate remedy would be, and at the very least, to make clear that scrupulousness with respect to these financial matters is very important for judges who are handling cases at this time. I would like to go further. Well, we don't have to debate that. I get your point, but I thought the basic rule of judging was if you have on appeal, if there are two reasons for coming out with decision X, all you need is one. You don't need to reach two. And that is certainly true. And we will take X or Y if it would lead to a reversal, vacature, remand. We think that we have strong arguments on both grounds. I did want to address the recusal issue, but I'm happy to talk about the merits if you would like me to do that, Judge Rakoff, because with respect to the pricing differences between the round lots and odd lots, the reasons for no electronic platforms, the reasons why the banks wouldn't engage and participate in startups, and the failures of InterVest and Bonds.com, there were improper analyses done, drawing inferences that were improper in the defendant's favor, but simply misunderstanding the nature of the complaint allegations that go to the motivations for the group boycott, the mechanisms by which the group boycott participated in stopping potential startups and addressing the injury that retail odd lot corporate bond investors get because of the wide spreads between the differences in how those bonds are done. My colleague will get up in a moment, and he will talk about some of these platforms. I would urge you to hear and listen to the words, retail investors, because in no situation have the defendants allowed a startup platform that allows retail investors to participate in a corporate odd lot bond purchase. And that's the fundamental part of this very super competitive spread that occurs in the pricing because of the defendant's important power that they have in the secondary market, which the complaint makes clear through the consolidation of the secondary market. So for these reasons, I think that it is important to understand that there was error here. The case should go back. This is too important an issue to the economy not to have the case dismissed on the merits, essentially with prejudice from the get-go. Further discovery, we believe, is going to reveal the contours of the group boycott and its injurious effects on the consuming public. I would like to save time for rebuttal if there are no further questions at this time. Yes. Thank you. Yes, Mr. Peppermint. Good morning, Your Honor. Yes, whenever you're ready. May it please the Court. Richard Peppermint, counsel for Goldman Sachs on behalf of all of the appellees. I'm going to start this morning where my colleague spent most of his time on the recusal issue, and I think Judge Nathan is correct that this Court's decision in Brock and Exxon prescribed a clear way there. I would submit that the case for vacating the judgment is even weaker here than in Brock for an important reason. The record shows that the district judge's spouse sold her stock in one of the defendants two months before oral argument on the motion to dismiss and three months before the decision. So, in addition to the first Liljeburg factor, cutting against vacater, because there's no risk of injustice to the parties because this Court will review the complaint de novo, I think also the third Liljeburg factor weighs heavily against vacater here, too, because the judge's spouse no longer owned the stock when the decision was handed down, and I think as this Court noted in Exxon on the public confidence factor, the public also has an interest in a speedy adjudication of disputes. My colleague appears to be arguing that the problem here is that Judge Caproni did not review the complaint de novo so you don't have another district judge reviewing the claims de novo and then appeal to this Court. I will say that is because this Court in this case, unlike in the Exxon case, denied the plaintiff's motive. Well, it doesn't matter the reason. I mean, yes, right, it wasn't held in abeyance, and so Judge Caproni took that to mean appeals going forward, as it has. I think that just circles back to the question of whether it matters in terms of the factors in public confidence and remedy of a conflict violation. Does it matter that you have a single-judge decision reviewed by a three-judge panel, or does it not? I submit, Your Honor, it does not. I don't think that there is a meaningful difference between three judges and four judges in the Brock case. Now, granted, that was a summary order. The matter was not remanded to a new district judge for the new district judge to consider the allegations de novo. I'm right. Brock's on all fours, but it's nonbinding. And I would submit that I don't think the Exxon panel accorded decisional, determinative significance to the fact that four judges reviewed the claims de novo rather than three. You know, I would also say it's interesting to me, if you look at the three cases where judgments have been vacated that appear prominently in the plaintiff's briefs, obviously there's the Supreme Court's Liljeburg decision, there's the Second Circuit's decision in Chase Manhattan Bank, and there was a Federal Circuit decision last year, the Centripetal case. It's notable in those cases that those were all appeals from bench trials, where obviously the district judge made credibility determinations and found facts. I would also submit to the Court that if you review those cases, there were unfavorable facts for the district judge. You know, my colleague accuses the defendants of arguing for a per se rule here. And I don't think we're arguing for a per se rule, because even if there is no injustice to the parties by virtue of this Court's de novo review, I mean, you could imagine cases where the facts are so bad that the third factor, public confidence, outweighs the first. And that's why I wanted to make the distinction here that we actually have a favorable fact here in that the stock was divested three months before the decision. You know, it was interesting when you read the plaintiff's opening brief on recusal, the very first sentence, I believe, on this section was, the district judge decided the issue while his spouse owned stock in one of the plaintiffs. And then there was a disclosure after the fact that that was in fact not true, that she had divested it in July and the decision was in October. I suppose that depends on what the meaning of decides is. Well, I mean, look, we have the facts in the record that we have. You know, the divestiture was two months before oral argument. Our oral argument was in September. The stock was divested in July. The decision was handed down in October. I mean, the plaintiffs speculate in their reply brief, well, we don't know when the judge started working on his opinion. But there's nothing in the record here. And I will say on the second factor, not to concede that, about whether the denial of relief will produce injustice in other cases, I mean, typically the reason, and the court said this in the Brock decision, that that factor weighs in favor of vacator is that you want to create incentives for district judges to be particularly vigilant in identifying conflicts in stock holdings. I mean, I will submit here, given the public attention that this issue has received in the Wall Street Journal and otherwise, the attention that it's received in Congress, it's not necessary for this court to vacate this judgment in order to create incentives for district judges in this circuit to be vigilant in looking for conflicts. Can't that also cut in the other direction as well, the idea that given the level of attention on this, at least currently, that does that weigh in favor of undermining public confidence? So, Your Honor, it does not in my view. Look, in Brock and in Exxon, the first factor, the risk of injustice to the parties had overriding significance because the decisions up in appeal were reviewed de novo. So, but the court in Exxon did notice the public confidence that the public has an interest in a speedy adjudication of disputes. But I do think the distinguishing factor here that makes the argument against vacator even stronger under the third factor is the divestiture three months before the decision was handed down. Can I ask you a question? I don't really understand the argument you just made a minute ago regarding that because the Wall Street Journal and others have exposed the very embarrassing failure of numerous district courts throughout the United States to enforce the law of the United States on recusal. That's good enough. We don't have to worry about that because the job has already been done and from now on judges will be vigilant. That seems like a strange argument. Well, Your Honor, the way the court articulated, I agree that would be a strange argument. My point was a minor one. In applying the second Liljeburg factor, one of the things that the Supreme Court in Liljeburg itself and then I think this court in Brock noted on that same factor is that vacator creates an incentive for other judges in different cases to be particularly vigilant. And I think it does it because it draws attention to the problem and it underscores the seriousness and significance of it. The only point I was making and it was a very minor one is that I don't think this issue has not received adequate attention by either the judiciary or the legislative branch or really in the public at large. And so it's not a thing where there was an isolated occurrence where the court should need to sort of expend more institutional resources on it just to draw attention to that issue. It was a minor point. Thank you for clarifying. I do just want to say two things. Well, I wanted to add. I may not have totally understood it, but Judge Rakoff made the point to opposing counsel, the X and Y point, and I might need clarity on what was X and what was Y, but it's the suggestion that if we were to conclude that the district court made errors, made inferences against the non-moving party, for example, then we would send it back. Without getting to the recusal question, and I think he said for de novo review and I'm not sure about that, but it is true that we would have to at the very least resolve not only the failure to state a claim, but also antitrust standing and the group pleading issue and the statute of limitations issue. Right. There were four alternative grounds for dismissal here. I mean, I would submit to the court that might not need to go beyond the first factor. I mean, I think there are three fundamental flaws with the conspiracy claim, which I'd like to touch on briefly, but there are four alternative grounds for dismissal, so therefore there are four alternative grounds for affirmance. I think if the court is going to affirm, the court obviously needs to address the disqualification recusal issue. At the end, as the court did in Brock. On the merits of the claim, there are three fundamental flaws that cut across it. I just want to touch on these briefly. The plaintiffs cannot distinguish. They really struggle to distinguish the platforms that the defendants allegedly boycotted from those that the defendants supported. My colleague during his argument said that I thought their argument was that where the defendants participated in certain platforms, I think it was Bloomberg, TradeWeb, and Market Access, that the reason they did that was to prevent those systems from offering the kind of availability of matched trades that would have considerably reduced their profit. I thought that's whether that argument is right or wrong. I think that the argument is along those lines. Yes. As I understand it, their argument is that the defendants participated in TradeWeb, Market Access, and Bloomberg because those platforms do not allow direct access to retail investors. Retail investors can access them indirectly through their broker or through their financial advisor. Indeed, that's what happens on the New York Stock Exchange. That's in paragraph 66 in the complaint. Retail investors don't access the New York Stock Exchange directly, the trade stock. They do so through brokers. With respect to TradeWeb, the record's clear that there are 60,000 retail investors that trade on TradeWeb indirectly through their investment advisor or through their broker. But what's critical, Your Honor, is that with one exception, none of the allegedly boycotted platforms allowed direct access to retail investors either. The only platform that allowed direct access to retail investors was BondStation, which allowed it for a mere three months. All of the other allegedly boycotted platforms, whether it's ABS, whether it's New York Stock Exchange Bonds, whether it's BondsPro, whether it's InterVest, whether it's TradingEdge, none of them allowed direct access to retail investors. So there's no distinction between the platforms that the defendants supported and those that they allegedly boycotted. Well, right, I see. I was going to say, I mean, with respect to the allegation of the support in order to prevent development that would allow it, I think that's consistent with the position that they don't allow it now, but that their investments and failure to develop the technology that would allow it, is that an available inference from the complaint? It's not, Your Honor. There are no allegations in the complaint, for example, that TradeWeb and Market Access had plans to offer direct access to retail investors and that the dealers, which were minority owners of those platforms, somehow blocked that plan. I mean, the allegations are that those platforms never did, never have offered direct access to retail investors. Now, they offer indirect access. As I said, 60,000 retail investors trade on TradeWeb through TradeWeb Direct. The complaint says that TradeWeb Direct executes one in seven bond trades today. I mean, it's an amazingly successful platform, but the retail investors access the platform through their broker or through E-Trade or through Fidelity or through Schwab. I mean, again, just as they do the New York Stock Exchange if they're trading stock. And, you know, if you think about it, the complaint says, and I think it's paragraph 148, it says in the United States, retail investors make up 5% of, it's paragraph 122, 5% of holdings of fixed income securities. So, I mean, it's not, if you're looking at it, the words of the Supreme Court, obvious alternative explanations, it's not surprising that platforms, given that retail investors can access it through their brokers or through their investment advisors, aren't committing the resources to bring into the market to access directly a group that's 5%, according to paragraph 122. The two other things that I wanted to say is, first, in my experience. Let me ask you, forgive me, I'm sorry to interrupt. Of course. In paragraphs, I think it's 166 to 171, plaintiffs allege that bonds.com terminated a platform called Bonds Station that was open to retail and institutional investors and allowed anonymous exchange-like trading, and the plaintiffs terminated that platform, terminated their, excuse me, that bonds.com terminated that platform after the defendants declined to route trading volume there, and that when that platform refocused on institutional investors but continued to try to make bond trading more transparent through an online exchange-like platform called Bonds Pro, no defendant would route trading volume into the Bonds Pro platform, and that Bank of America explicitly stated that it would only participate if other large dealers such as Morgan Stanley or J.P. Morgan also participated. So why isn't that some evidence from which a reasonable juror could draw an inference of collusion? So, Your Honor, let me walk through that because I think it's important. So with respect to Bonds Station, that was the one exception that I mentioned earlier, that for three months, Bonds Station offered direct access to retail investors. And in paragraph 167, the first sentence, the plaintiffs allege, after just three months, however, Bonds.com jettisoned Bonds Station's retail oddlot focus amidst pressure from dealers such as defendants. Now, that is the sort of classic sort of group pleading where the complaint fails to plead any facts that put the conduct in context that gives rise to a plausible suggestion that it was pursuant to a preceding boycott agreement. It's just dealers such as defendants. You contrast that with the allegations that this Court sustained in American News where there all the defendants ceased dealing with the plaintiff, Anderson, all at once within three business days. And those three business days were preceded by two weeks where the defendants met and spoke with one another. And then after they ceased, as this Court put it, in virtual lockstep, the deal with the defendant, they made statements that suggested that there was agreement. Here we just have a very generalized allegation amidst pressure from dealers such as defendants. Now, with respect to the successor platform, Bonds Pro, Bonds Pro, it's not alleged, never had any plans to offer retail investors direct access. I mean, Bonds Pro really is indistinguishable from TradeWeb and MarketAccess. And if you look, is there an obvious alternative explanation for why the defendants didn't rush to support Bonds Pro? Why the defendants allegedly wanted to wait and see if any other large dealers submitted it? At this point in time, you have to realize there are already three successful thriving platforms. The complaint alleges that virtually all startup platforms fail within a matter of years. The complaint alleges that in the late 90s and early 2000s, 89 startup platforms were formed and went out of business within several years. Given that there are already three existing thriving platforms, it makes perfect business sense for the defendants to take a wait-and-see approach. Let's see if our customers ask to trade on this platform. Let's see if any other large dealers join it before investing the time, the resources, and efforts to onboard to a brand-new startup platform. And then one other point I'd make, because I recognize I'm well past my time, is I honestly think that this is one of the cases that becomes even less persuasive when you look at the allegations as a whole. Because when you look at the allegations as a whole, what you see is that the alleged parallel conduct is sort of isolated, episodic events involving different combinations of defendants at different points of time spread over a more than 20-year period. I mean, the only common denominator among all these allegations is that they all relate to corporate bonds. But otherwise, it's just like isolated, episodic things, you know, something in the late 90s, something in 2004, something in 2012. And they don't plead any facts that would create a context for the parallel conduct where this court could say that it plausibly suggests that this conduct was undertaken pursuant to a preceding agreement. I mean, in the words of Twombly, they haven't nudged their claims across the line from possibility to plausibility. Or as Twombly also put it, at most, the conduct alleged  It doesn't plausibly suggest conspiracy. Thank you, Your Honor. Thank you. Notably, my friend doesn't address the motivation that the banks had to engage in super-competitive profit-taking, which they were able to do through their group boycott of platforms that would penetrate the concentration of dealer-brokers that they, the banks, controlled. And that's the thesis of the complaint, that because of their dominant role in the primary market for bonds, the banks also were able to control the secondary market after the breaking up of the round-lot bonds into smaller ones. And the result of that is the super-competitive profit-taking through the spreads. Nowhere do they acknowledge that this is happening, they have a motivation to do it, and that they are, in fact, doing it through these catch-and-kill techniques. Every time there is a purchase of an odd-lot bond, there is a continuing violation and a new violation of the antitrust laws. Can I just jump in? Aside from the question of whether there's motivation to engage in this improper conduct, what are the things that you point to, the pleadings that go to the idea that there was, in fact, an agreement or a conspiracy? What are the things that support that beyond motivation for this? They acted in parallel. They involved themselves in being joint venturers in projects that, to give you bonddesk.com, for instance, they purchased it once, they got rid of the management interested in retail sales. Could you be just specific in answering the question, when you say they, who do you mean? The defendants. So the sentence you just uttered, the they, refers to all of the defendants? Nine of the ten were purchasers of bonddesk.com. And at various points in time, the complaint alleges, Judges Lee and Nathan, that they acted in parallel because of their motivation to protect the profits that the group of them were able to have. And so at various times, nine of the ten acted in concert. At other times, two banks were alleged to have threatened Bank of America or to cause Bank of America to seek cover. That's in paragraph 170. I think that goes to, I mean, I guess a couple of thoughts. I mean, yes, parallel behavior is one thing, but you do have to show the plus factor. And I think one thing I'm thinking about and this relates to what Judge Nathan was asking you, the incident with the Tennessee bank that was pressured or what have you, that that involved two particular banks. And so this idea of how do we show the agreement among all of them? I think you show the agreement through the parallel conduct and you show the individual actions to perpetuate the conspiracy through individual acts. It didn't require all nine or ten of the defendants to punish or threaten First Tennessee or to punish or threaten Bank of America, for instance. Several were sufficient. And we know that's... That sort of starts from the presumption of, of course, they're all working together and they're working together and all ten of them didn't need to threaten this bank. Two of them could handle it. But what... We have to go in the other direction from, okay, two of them were involved in this. What is there to suggest this is the action of all of them? I think that the pleading standard that that would require, Judge Lee, is much higher than what this circuit has allowed for pleading of conspiracy, where the conspiracy is all directed toward the accomplishment of a single objective, which I've outlined and has not been denied. And the question is, are there acts in furtherance of that conspiracy that support the objective of the conspiracy and the complaint pleads that that has also happened? And I think that's sufficient as a matter of pleading because to impose too high a standard in a situation where the communications among these defendants are secret, it's very difficult to penetrate these various chat rooms and other engagements. But we do know from other cases that the banks have engaged in these similar kinds of activities, whether it's foreign exchange or it's LIBOR or it's credit default swaps or it's ISDA fix or it's interest rate swaps. These are plausible... If I understand your argument, I'm not sure what I think about, but if I understand your argument, it is to make a conspiracy, of course, it only requires two defendants. You don't need to prove that all the defendants you've named necessarily were part of that conspiracy. But if you allege sufficient facts to show that two are members of an illegal conspiracy and you then show that the others go along in parallel method, in parallel steps, then you have satisfied the plus factor required by the law. I take that's your argument. I think that's correct. And the further way to help understand this is that because it was a continuing arrangement for a number of years, there will be facts that are going to need to be adduced as to whether or not any defendant at some point said, no mas, we're not going to do this anymore. But that's not something to reject the complaint on its core allegations. That is a question of fact that would be decided later in the case. I think that the other point that I'd like to draw out is that even the dealers, 75% of whom said that the defendant's resistance to having this kind of retail availability for them was the reason for many of the issues that I'm describing here. That's paragraph 191. And as I predicted, the point is not brought out that the three platforms that are successful actually have ready access. Even my colleague acknowledges that they all have to be routed through the defendant-dealer brokers. And it's precisely because there is no transparency on the pricing that there is no ability to determine what is the fairest price for the acquisition or sale of these odd-lot corporate bonds. Judge Rakoff, you mentioned the trade web and purchasing a bond test. I want to point out that the defendants did it not just once in this acquisition. They acquired bond desk twice. In both instances are situations in which they stopped the ability of bond desk to be a competitive retail opportunity. I'd just like to close on the recusal point. Judge Nathan, this isn't Brock. I think there are ways to distinguish it on these grounds. Here we do not have a pro se plaintiff. We have expert analysis showing a whole range of super competitive profits. The complaint is proving illogical behavior on the part of the defendants. And the panel in Brock found that there were obvious deficiencies in Brock's pleadings, which I would submit you should not find here and therefore no harm under Lilleberg. On the question of Exxon, whether or not the addition of additional judge makes a difference, we submit that actually it does because structurally Judge Viscoso there did look at the merits before that was reviewed on appeal and this court determined that that was not a basis for determining vacature. Finally, we don't know that many of the facts about what actually happened because there's not a mechanism to learn them. And that is a problem that constrains your decision making as well as our advocacy ability with respect to the recusal issue. What we do know is that the judge owned the stock or his spouse owned the stock for 15 months while the case was pending in his court. We didn't find out about that until 17 months later when a clerk letter in March of 22 after the case was already jurisdictionally in this court. And so how we assess the sale of the stock, at what point the judge should have known, these are all questions that we simply don't have a record to support. But I would urge you to consider the importance of public confidence in this matter because the press and the Senate cannot do the judiciary's job to police itself and to ensure that district judges don't preside over cases where they have, where their family members have a financial interest. Public confidence in this process matters and we urge you to vindicate that by vacating and remanding the case so that it can proceed in this very important issue with respect to the financial markets. Thank you. Thank you both. We'll take the case under advisement.